**Affirmed as Modified and Opinion Filed April 17, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00224-CR

**SYLVIA RENE WILLIAMS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 401st Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 401-81042-10**

## MEMORANDUM OPINION

Before Justices Moseley, Francis, and Lang
Opinion by Justice Francis

Following a bench trial, Sylvia Rene Williams was convicted of reckless injury to a disabled woman after she soaked the woman's feet in hot water, causing severe burns. The trial court assessed punishment at ten years in prison, suspended the sentenced, and placed appellant on community supervision for five years. In two issues, appellant argues the evidence is insufficient to support her conviction and the trial court failed to properly consider her "medical care" defense. We affirm.

At the time of the incident, Sharon Justice was fifty-five years old and had lived in state facilities most of her life. Sharon was born with cerebral palsy and mild mental retardation and had also been diagnosed with schizophrenia. She was confined to a wheelchair and required 24-hour care to help her with most of her activities of daily living. For example, Sharon had to be

bathed and wore a diaper. She could, however, verbally communicate and carry on a conversation.

In 2009, Sharon went to live in a state-licensed group home in Allen, Texas, owned by Frank Nerkowski. The home provided 24-hour care. There were two other residents at the home, and appellant was one of three caregivers whose job was to take care of the residents' needs. While she could be "sweet" at times, Sharon also could be "difficult" and would sometimes curse at her caregivers, call them the "N" word, and throw things at them.

Evidence showed that in July 2009, Sharon weighed 180 pounds. Over the following months, her caregivers noticed a decline in Sharon's health. She refused to eat, began losing weight, and became weaker and weaker. She was not as verbal and was much more listless. On February 10, 2010, Sharon injured her toe and had to have the toenail removed. She was taken to the hospital emergency room, where instructions were given to bathe Sharon's foot in lukewarm water.

On the mornings of February 17 and 18, appellant soaked Sharon's feet in water. On the night of the 18th, Sharon was taken to Allen Presbyterian Hospital where she was in critical condition on arrival. According to nurse Heather Lee, the emergency department supervisor, Sharon's feet were badly burned. In addition, Sharon's body had bruises, bed sores, and ligature marks on her arms. Sharon did not communicate with hospital staff and did not respond to painful stimuli, such as insertion of IVs. Believing Sharon had been abused, hospital staff contacted the police. Allen police officer Chance Graves responded to the call and saw the injuries to Sharon's body. He noted that the ligature marks appeared to be "old" because they were scabbing and went from Sharon's arms around her back, as if she had been tied with her "arms against her body." Sharon was unable to communicate. Once Sharon was stabilized, she was CareFlited to Parkland Hospital in Dallas, where she was hospitalized for one month.

Dr. Brett Arnoldo, a burn surgeon at Parkland, was Sharon's treating physician. When she arrived, she had second- to third-degree burns on her feet and ankles. The skin was blistering and falling off, and the injuries were consistent with her feet being immersed in hot water. When asked at what degree of water skin begins to burn, Arnoldo responded it was a "difficult question." He said the water has to be hot enough and the duration long enough to burn, and one study showed a temperature of 140 degrees can result in a burn wound in a few seconds. He said another factor to consider would be the thickness of the skin, noting that skin is thinner on some parts of the body, such as the eyelid, and is thinner in infants and the elderly.

Arnoldo said that when he began treating Sharon, she was "severely ill" and "septic," but he did not believe the burns were the "primary driver" of the sepsis; rather, he attributed that to an existing urinary infection. Sharon was put on a ventilator and given antibiotics for infection. She had low blood pressure, which decreased the blood flow to her feet and contributed to the "depth of the injury." Ultimately, Arnoldo said, Sharon's feet could not be saved, and her legs were amputated from the calves down.

Allen police investigated the incident. Investigator Brandon White and criminologist Curtis Fulk went to the group home hours after Sharon's hospitalization. They found a blue bucket in Sharon's bedroom and noticed "dead skin" on the ground. They also saw latex gloves and an antiseptic in the trash can. Fulk took pictures and tested the hot water temperature in the bathroom closest to appellant's room and in a hallway bathroom. The temperatures, respectively, were 135 degrees and 137 degrees. The thermostat on the hot water heater was set between 125 and 150 degrees. Police later returned to check the temperature of the water from the kitchen faucet, and testing showed it to be about 100 degrees when the handle was midway between hot and cold. However, by the time of this testing, the state licensing agency had begun its

investigation and required the home to adjust the hot water heater thermostat. Photographs of Sharon's legs, her room, and the water temperature readings were admitted into evidence.

Six days after Sharon was injured, Investigator White interviewed appellant at the Allen Police Department. A recording of the interview was admitted as evidence. In the interview, appellant said she soaked Sharon's feet two mornings in a row in a bucket of soapy lukewarm water according to the instructions she was given. She said the water was not hot on either day. She took the water from the kitchen faucet, turning the handle midway between hot and cold. When asked specifically about the second day, appellant said she had on a glove when she tested the water by placing her hand in the bucket. She said she saw no steam coming from the water, and Sharon did not complain or cry out or give any sign she was in pain when she placed her feet in the water.

Appellant said she let Sharon's feet soak for fifteen to twenty minutes. When she removed her feet, they were red and had "water pockets." When appellant placed a towel on the water pockets, they burst and drained. She said the skin on Sharon's feet was "pulling back." When a second worker, Andrea Jackson, arrived a short time later, appellant showed her Sharon's feet and explained that she had soaked them. Jackson told appellant it was "dead skin." Appellant's shift ended, and she left for the day but called later to check on Sharon. Before her shift was to begin that night, Nerkowski called and told her not to come into work because Sharon was in the hospital and the incident was under investigation. Appellant told the officer she would not do anything to hurt Sharon but said she knew Sharon was "fragile." She said she should not have worn gloves when checking the water. She also said she did not have a nursing background.

At trial, Jackson testified she worked with appellant at the Allen group home, had worked with her at another facility, and the two were friends. Jackson acknowledged that Sharon could

be difficult at times and would throw water or juice on her caregivers, curse at them, and call them names, including the "N" word. In the months before the incident, Sharon's health was declining and she was "more hostile" and "very verbal."

Jackson said her shift began at 8 a.m. on February 18, and she arrived ten to fifteen minutes early. Appellant told her she had soaked Sharon's feet and showed her how they looked. Sharon was sitting on the couch in her room with her feet propped up. Her feet were "blistered up," like the skin "was holding water." After seeing Sharon's feet, Jackson said she touched the water in the bucket with her elbow and it was not hot. On further questioning, however, she acknowledged she may have confused February 17 and 18, and it was possible that on the day Sharon's feet were burned, there was no water in the bucket when she arrived.

Jackson said Nerkowski arrived as appellant was leaving. Nerkowski also looked at appellant's feet. He left and returned twenty minutes later and tried to apply an antiseptic to them. Jackson said she checked on appellant throughout her shift that day. During that time, Sharon "wasn't herself" but was "still verbal." When Jackson left at 2 or 3 p.m., she said appellant's feet did not look as they did in the photographs taken at the hospital hours later. Jackson said she believed appellant followed the directions on paper, provided by the hospital, regarding soaking Sharon's feet. She also testified that appellant cared about Sharon and did things for her apart from her responsibilities as a caregiver, such as taking her to the store and making sure she talked to and saw her mother.

Appellant testified in her defense. She said she had worked at the home for about four months before this incident. At the time of the incident, she was working the 8 p.m. to 8 a.m. shift, Monday through Friday, and was essentially a "babysitter." She had no medical training. Appellant said she and Sharon had a "good friendship relationship." She took Sharon to the store so that she could "get some fresh air," took her shopping, and took her to Bonham on a

couple of occasions to visit her mother. She also made sure she talked to her mother on the telephone.

A week before the incident occurred, Sharon injured her toe and was treated at the hospital emergency room. When Sharon was released, the hospital gave instructions for Sharon's foot to be soaked in lukewarm soapy water.

Appellant said she soaked Sharon's feet for the first time on February 17 and followed the instructions given by the hospital. Appellant said she had on gloves and ran water from the kitchen faucet into a blue bucket and used shampoo for the "soapiness." She said she used her hands to "[m]ake the suds bubble up." The water "reached all the way" past her wrist, and she said "it wasn't hot. It was just warm." She carried the bucket to Sharon's room, where she awakened Sharon, put her in her wheelchair, and soaked her feet for fifteen to twenty minutes. During this time, Sharon did not indicate in any way that she was in pain or uncomfortable. Afterwards, she laid Sharon on the couch and dried her feet. Nothing out of the ordinary occurred during the remainder of her shift.

The next morning, at about 7 or 7:15 a.m., she soaked her feet a second time. Appellant said she did nothing different from the previous day. Again, she wore gloves and used water from the kitchen. Steam did not come out of the faucet, and she said the water was lukewarm. As before, she said the water touched her skin and it was not hot. When she lifted up Sharon's feet to place them in the water, Sharon made a noise. Sharon did not, however, indicate she was in pain or discomfort while her feet were in the water. She said if the water had been too hot, Sharon could have communicated that to her. Again, she let Sharon's feet soak fifteen or twenty minutes. During that time, she said she never left her room. She checked her feet at one point and they were "fine." But, when she finished soaking them, Sharon's feet and ankles had "water pockets" or "[w]ater up under the skin."

–6–

When Andrea Jackson arrived to relieve her, appellant told her she had soaked Sharon's feet, but there were water pockets on her feet. Appellant did not believe Sharon was injured and did not believe she needed emergency care. As she was leaving, Frank was pulling up. Appellant called the home at 10:30 or 11 a.m. to "see what was going on," and Jackson told her "everything was all right." At about 6:30 p.m., Frank called her, said Sharon was in the emergency room, the home was under investigation, and not to come to work.

On cross-examination, appellant acknowledged that she was aware, at the time she soaked Sharon's feet, that water can burn skin. She also acknowledged that she knew Sharon was "fragile" and her health was in decline. She knew Sharon could not remove her feet from the water without appellant's help. Appellant agreed she was the only person who soaked Sharon's feet on February 18 and she was the one who burned Sharon's feet.

In a two-paragraph indictment, appellant was charged with intentionally, knowingly, or recklessly causing serious bodily injury to Sharon. The specific act alleged was "placing [Sharon's] feet in hot water." After hearing the evidence, the trial court convicted appellant under the second paragraph, recklessly causing serious bodily injury, a second-degree felony. *See* TEX. PENAL CODE ANN. § 22.04(a)(1), (e) (West Supp. 2013).

On appeal, appellant does not dispute that Sharon, a disabled person, was seriously injured by her conduct. Rather, she argues (1) she did not have the required mental state and (2) she was acting under medical directives, a defense to the charge.

In reviewing a challenge to the sufficiency of the evidence, we examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Therefore, when analyzing the sufficiency of the evidence, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id*. Direct and circumstantial evidence are treated equally. *Id*.

As alleged here, to sustain a conviction for reckless injury to a disabled person, the evidence must prove appellant, by act, caused serious bodily injury to a disabled person. *See* TEX. PENAL CODE ANN. § 22.04(a)(1) (West 2013). Injury to a disabled person is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). A person acts recklessly . . . "when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur." *See* TEX. PENAL CODE ANN. § 6.03(c) (West 2011). The risk created "must be of such a nature and degree that its disregard constitutes gross deviation from the standard of care that an ordinary person would exercise under all the circumstances, as viewed from the actor's standpoint." *Id*. Whether an act involves a substantial and unjustifiable risk "requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight." *Id*. (quoting *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994)). Mere lack of foresight, stupidity, irresponsibility, thoughtlessness, and ordinary carelessness do not suffice to constitute criminal recklessness. *Williams*, 235 S.W.3d at 751.

We begin with appellant's first argument in which she asserts there is no evidence she was subjectively aware of a substantial and unjustifiable risk Sharon's feet would have to be amputated "from following the instructions of the hospital by soaking [them] in warm water." She also asserts the record is devoid of any evidence she "consciously disregarded" such a risk

and she had "no reason to know or believe" that soaking feet "in warm water" would cause any injury needing immediate medical attention.

First, we note the risk of which appellant had to be aware was not amputation; rather, she needed only be aware of the type of harm, that Sharon could be severely burned. Her argument otherwise is premised on the notion she soaked Sharon's feet in "warm" water. The evidence, however, shows the contrary. Sharon's feet were severely burned immediately upon removing them from the water. Even by appellant's testimony, they were red and had "water pockets." Shortly after appellant soaked Sharon's feet, Jackson arrived. She looked at Sharon's feet and agreed they were "blistered up" and looked like they were "holding water." Evidence showed the hot water temperature in the two bathrooms was 135 to 137 degrees, and the thermometer on the hot water heater was set between 125 and 150 degrees. Dr. Arnoldo testified skin can burn in seconds at 140 degrees. From this evidence, the trial court could have concluded Sharon's feet were placed in a bucket of hot, not lukewarm, water.

The evidence showed appellant was aware of but consciously disregarded a substantial risk that Justice would be seriously injured by her actions. Appellant testified that at the time she prepared the bucket of soapy water, she was aware hot water could burn skin. She also knew Sharon was in a medically "fragile" condition and knew Sharon could not remove her feet from the water. Although appellant argues she tested the water first, the trial court did not have to believe her testimony. And, even by her own testimony, her hands were protected by gloves. She did not submerge her bare hands into the water; at most, the water "hit" or "touched" her skin, which would not have provided an accurate measure of the true heat of the water. Appellant acknowledged as much when she told the police more than once that she should not have worn gloves when testing the water. In sum, the trial court could have concluded a reasonable person would have exercised considerably more caution than did appellant. In

particular, a reasonable person would have made sure the temperature of the water was lukewarm. As a rational finder of fact, the trial court further could have concluded that disregarding the risk created by failing to properly check the water's temperature constituted a gross deviation from the standard of care that a reasonable person would have exercised in the same situation.

To the extent appellant argues she was not medically trained, nothing in the record suggests medical training was needed for appellant to recognize "lukewarm" water. The fact that others at the facility did not seek medical attention for Sharon for several hours does not negate the evidence that appellant acted recklessly and caused serious injury to Sharon. We conclude the evidence was sufficient to show appellant was aware of the risk of causing serious bodily injury to Justice but disregarded the risk, thus proving the mental state of recklessness. We overrule the first issue.

In her second issue, she argues the trial court failed to "properly consider" her statutory defense set out in section 22.04(k) of the penal code. Under subsection (k), it is a defense to prosecution that the act consisted of "reasonable medical care occurring under the direction of or by a licensed physician[.]" Appellant argues even if she recklessly caused serious bodily injury to Sharon, she did so while providing "reasonable medical care under the direction of a physician." We cannot agree.

The only evidence in this case regarding any medical directives was testimony that the hospital gave written instructions to soak Sharon's foot in lukewarm, soapy water. The evidence, however, does not support appellant's testimony that she placed Sharon's feet in lukewarm water. Rather, the evidence shows appellant's feet and ankles suffered at least second-degree, if not third-degree, burns, supporting a finding that appellant placed Sharon's feet in extremely hot water. Moreover, the instructions were directed only at the foot with the toe

injury, and appellant soaked both feet. Finally, the written instructions were not offered or admitted as evidence. Without the written instructions, no evidence shows they came from a licensed physician as opposed to a nurse or other hospital employee. We conclude the evidence was sufficient to support the trial court's rejection of appellant's medical care defense. We overrule the second issue.

Finally, the judgment in this case shows appellant was convicted under section 22.04(f) of the penal code. Section 22.04(f) sets out the degree of felony for a person convicted of causing bodily injury, not serious bodily injury. *See* TEX. PENAL CODE ANN. § 22.04(f). The trial court found appellant guilty of recklessly causing serious bodily injury. The degree of felony for serious bodily injury is set out in subsection (e). *See* TEX. PENAL CODE ANN. § 22.04(e). Under subsection (e), when the conduct is engaged in recklessly, the offense is a second-degree felony. *Id.*

This Court has the authority to "speak the truth" when we have the necessary data and information to do so. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, on our own motion, we modify the judgment in this case to reflect the correct statute for the offense as section 22.04(a)(1), (e) of the penal code, and to show the correct degree of offense as a second-degree felony.

As reformed, we affirm the trial court's judgment.



/Molly Francis/
Do Not Publish                                      MOLLY FRANCIS
TEX. R. APP. P. 47                                  JUSTICE
130224F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SYLVIA RENE WILLIAMS, Appellant

No. 05-13-00224-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 401st Judicial District Court, Collin County, Texas
Trial Court Cause No. 401-81042-10.
Opinion delivered by Justice Francis;
Justices Moseley and Lang participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

To reflect (1) the <u>Statute for Offense</u> as section 22.04(a)(1), (e) of the Texas Penal Code and (2) the <u>Degree of Offense</u> as Second-Degree Felony.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered April 17, 2014

/Molly Francis/
MOLLY FRANCIS
JUSTICE